UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL ACTION NO. |
| Plaintiff, | 25-CV-00127 |
| | (              , J.) |
| -against- | (              , M.J.) |
| SPECTRUM WHOLESALE INC. and THOMAS J. CICCARELLI | **COMPLAINT** |
| Defendants. | |

-----------------------------------------------------------X

The United States of America, by and through its attorney, Breon Peace, United States Attorney for the Eastern District of New York, acting on behalf of the United States Environmental Protection Agency ("EPA"), alleges for its Complaint against Defendants, Spectrum Wholesale Inc., ("Spectrum") and Thomas J. Ciccarelli ("Ciccarelli" collectively "Defendants"), as follows:

## NATURE OF THE ACTION

1. This is a civil action for Defendants' illicit sale of hundreds of products designed to remove, bypass, defeat, or render inoperative the elements of design and emissions controls that vehicle and engine manufacturers use to meet emission standards, in violation of the Clean Air Act ("CAA") and the EPA's implementing regulations.

2. The CAA and the EPA's regulations prohibit any person from selling, offering to sell, or installing "Aftermarket Defeat Products," any part or component intended for use with a motor vehicle engine where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design in the motor vehicle or engine.

3. Aftermarket Defeat Products can exponentially increase harmful emissions from motor vehicles.

4. Defendants' sale of approximately 672 illegal Aftermarket Defeat Products between October 18, 2019 and September 2, 2020, and any subsequent sales, caused significant increases in oxides of nitrogen ("$NO_x$"), carbon monoxide ("CO"), non-methane hydrocarbons ("NMHC"), and particulate matter ("PM") emissions.

5. This action seeks injunctive relief and civil penalties for Defendants' violations of the CAA and EPA's regulations.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of and the parties to this action pursuant to 42 U.S.C. §§ 7413(a)(3)(C), 7523(a), and 7524(b), and 28 U.S.C. §§ 1331, 1345, and 1355(b)(1)(A).

7. Venue is proper in the Eastern District of New York ("EDNY") pursuant to 28 U.S.C. § 1391(b)(2), as well as 42 U.S.C. §§ 7523 and 7524, because it is a judicial district in which the Defendants are located, reside, do business, and/or in which some of the alleged violations occurred.

## DEFENDANTS

8. Spectrum is a New York corporation owned and managed by Ciccarelli. Spectrum's principal place of business is Oakdale, New York. The New York State Department of State, Division of Corporations' Corporation and Business Entity database lists an Oakdale, New York address for both Spectrum and Ciccarelli.

9. Defendants primarily sold products through the internet.

10. Spectrum is a "person" as defined by Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

11. Ciccarelli is an individual and agent/officer of Spectrum, and therefore a "person" as defined Section 302(e) of the CAA, 42 U.S.C § 7602(e).

## BACKGROUND

## CLEAN AIR ACT REGULATION OF AFTERMARKET DEFEAT PRODUCTS

12. The CAA claims in this action arise under Title II of the Act, as amended, 42 U.S.C. §§ 7521-7590, and the regulations promulgated thereunder relating to the control of emissions of air pollution from motor vehicles and motor vehicle engines.

### A. Statutory and Regulatory Objectives

13. In enacting the CAA, Congress found that "the increasing use of motor vehicles ... has resulted in mounting dangers to the public health and welfare." 42 U.S.C. § 7401(a)(2). Congress's purposes in creating the Act were "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population" and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." 42 U.S.C. § 7401(b)(1)-(2).

14. Title II of the CAA and the regulations promulgated thereunder establish stringent standards for the emissions of air pollutants from any class or classes of motor vehicles and motor vehicle engines, and from classes of nonroad vehicles or engines, that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §§ 7521(a), 7547(a)(3). These pollutants include, but are not limited to, PM, $NO_x$, NMHC, and CO. 42 U.S.C. § 7521(a)(3)(A).

15. EPA has established National Ambient Air Quality Standards for certain pollutants, including ozone, $NO_x$, PM, and CO. *See* 40 C.F.R. §§ 50.1-50.19.

16. PM is a form of air pollution composed of microscopic solids and liquids suspended in air. PM is emitted directly from motor vehicles, however, PM can also form in the atmosphere from the emission of other pollutants, including $NO_x$ and NMHC which are emitted from motor vehicles.

17. Ozone is a highly reactive gas that forms in the atmosphere from emissions of other pollutants, including $NO_x$ and NMHC, which are emitted from motor vehicles.

18. Exposure to PM and ozone is linked to respiratory and cardiovascular health effects as well as premature death. Children, older adults, people who are active outdoors (including outdoor workers), and people with heart or lung disease are particularly at risk for health effects related to PM or ozone exposure.

19. CO is a highly toxic gas that can cause headaches, dizziness, vomiting, nausea, loss of consciousness, and death. Long-term exposure to CO is associated with an increased risk of heart disease.

20. The CAA includes a framework that strictly regulates these harmful motor vehicle emissions. Original equipment manufacturers ("OEMs" or "manufacturers") must design motor vehicles and motor vehicle engines to conform to established emissions standards for $NO_x$, CO, NMHC, PM, and other pollutants. 42 U.S.C. § 7525(a)(2); *see* 40 C.F.R. §§ 86.007-30(a)(l)(i), 86.1848-01(a)(l).

21. Testing has shown that removing emissions controls from a motor vehicle can substantially increase pollutant emissions. *See* 66 Fed. Reg. 5062 (2001). For example, EPA testing has found that defeating or deleting a motor vehicle's emissions controls can increase tailpipe $NO_x$ by a factor of up to 300 times, tailpipe CO by a factor of approximately 130

times, tailpipe NMHC by a factor of approximately 1,000 times, and tailpipe PM by a factor of up to 37 times.

### B. Acts Prohibited by the Clean Air Act, 42 U.S.C. § 7522(a)(3)(B)

22. Under Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), it is prohibited for "any person to manufacture or sell, or offer to sell, or install any part or component intended for use with, or as a part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."

23. Section 203(a) of the CAA also prohibits "causing" any of the prohibited acts listed in that section. 42 U.S.C. § 7522(a).

24. Each part or component manufactured, sold, offered for sale, or installed in violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), is a separate violation. 42 U.S.C. § 7524(a).

### C. Emission-Related Elements of Design in Motor Vehicles and Motor Vehicle Engines

25. In order to sell or offer to sell motor vehicles and motor vehicle engines, manufacturers must apply for and obtain from the EPA a certificate of conformity with the EPA's emission standards. 42 U.S.C. §§ 7521, 7522(a)(1), 7525.

26. "Motor vehicle" is defined as "any self-propelled vehicle designed for transporting persons or property on a street or highway." 42 U.S.C. § 7550(2); 40 C.F.R. § 85.1703.

27. To obtain a certificate of conformity, the manufacturer must demonstrate that the motor vehicle or motor vehicle engine will conform to established emissions standards for PM, $NO_x$, NMHC, CO, and other pollutants during a motor vehicle or motor vehicle engine's useful life. 42 U.S.C. § 7525(a)(2); *see* 40 C.F.R. §§ 86.007-30(a)(1)(i), 86.1848-01(a)(1).

28. The certificate of conformity application must describe, among other things, the emission-related elements of design of the motor vehicle or motor vehicle engine. *See* 40 C.F.R. § 86.094-21(b)(1) ("The application ... shall include the following: ... a description of [the vehicle's] ... emission control system and fuel system components."); *see also* 40 C.F.R. § 86.1844-01(d)-(e).

29. An EPA-issued certificate of conformity only covers those new motor vehicles or motor vehicle engines that conform in all material respects to the specifications provided to EPA in the certificate of conformity application for such vehicles or engines. 40 C.F.R. § 86.1848-01(c)(6).

30. OEMs install a variety of hardware and software elements of design in motor vehicles and motor vehicle engines that control emissions of pollutants to comply with the CAA and obtain certificates of conformity. An "element of design" is "any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of systems interactions, and/or hardware items on a motor vehicle or motor vehicle engine." 40 C.F.R. § 86.1803-01.

Elements of design installed to comply with CAA regulations are hereinafter referred to as "Emission-Related Elements of Design."

31. Diesel Particulate Filters ("DPFs") are Emission-Related Elements of Design that reduce the level of PM pollution contained in engine exhaust gas by filtering it out.

32. Diesel Oxidation Catalysts ("DOCs") are Emission-Related Elements of Design that reduce CO and NMHC emissions by promoting the conversion of those pollutants into less harmful gases.

33. Selective Catalytic Reduction ("SCR") Systems are Emission-Related Elements of Design that reduce $NO_x$ emissions by chemically converting exhaust gas that contains $NO_x$ into nitrogen and water through the injection of diesel exhaust fluid.

34. $NO_x$ Adsorption Catalysts ("NACs") are Emission-Related Elements of Design that reduce $NO_x$ emissions by chemically adsorbing $NO_x$ from exhaust gas.

35. Pursuant to 42 U.S.C. § 7521(m), the OEM is required to install an Onboard Diagnostics ("OBD") System on motor vehicles that must monitor, detect, and record malfunctions of all monitored Emission-Related Elements of Design. 40 C.F.R. §§ 86.007-17, 86.010-18, 86.1806-05.

36. The OBD System monitors and detects malfunctions of Emission-Related Elements of Design through a network of sensors installed throughout the motor vehicle and motor vehicle engine.

37. When the OBD System detects a malfunction of an Emission-Related Element of Design, such as the removal of the DPF system, the OBD system records a diagnostic trouble code that identifies the malfunction or deterioration and illuminates a malfunction indicator light on the dashboard. *See* 40 C.F.R. § 86.1806-05(6)-(e). Depending on the

malfunction or deterioration, such as one triggered by the removal of the DPF system, the OBD system may also downgrade vehicle performance.

38. The OBD System is an Emission-Related Element of Design.

39. Exhaust Gas Recirculation ("EGR") Systems are Emission-Related Elements of Design that reduce $NO_x$ emissions by recirculating exhaust gas through the engine, thereby reducing engine temperature and $NO_x$ emissions.

40. "Aftertreatment" refers collectively to the Emission-Related Elements of Design "mounted downstream of the exhaust valve ... whose design function is to reduce emissions in the engine exhaust before it is exhausted to the environment." 40 C.F.R. § 1068.30. DPFs, DOCs, SCR Systems, and NACs are all part of Aftertreatment.

41. Aftertreatment Emission-Related Elements of Design are contained in OEM-installed, stock exhaust pipes.

42. OEMs set software parameters, also known as calibrations, that control, among other things, engine combustion and Aftertreatment performance (hereinafter referred to as "Certified Stock Calibrations"). 40 C.F.R. § 86.1803-01.

43. OEMs disclose Certified Stock Calibrations on their application for a certificate of conformity for each vehicle model because they are part of a motor vehicle's overall emissions control strategy. Certified Stock Calibrations that must be included in the certificate of conformity application include "fuel pump flow rate, ... fuel pressure, ... EGR exhaust gas flow rate, ... and basic engine timing." 40 C.F.R. § 86.1844(e)(2); *see also* 40 C.F.R. Part 85 App. VIII (listing vehicle and engine parameters and specifications); 40 C.F.R. Part 86 App. VI (listing vehicle and engine components). Certified Stock Calibrations are Emission-Related Elements of Design.

44. Oxygen Sensors are Emission-Related Elements of Design that detect the ratio of air to fuel during fuel combustion and provide such data to the OBD system. An imbalanced air-to-fuel ratio can result in increases in $NO_x$ or NMHC emissions.

45. Motor vehicles are equipped with Electronic Control Units ("ECUs"), which are computers that monitor and control vehicle operations, including the operation of Emission-Related Elements of Design described in Paragraphs 28-42. OBD Systems and other Emission-Related Elements of Design operate in conjunction with ECUs.

46. Emission-Related Elements of Design are installed in motor vehicles or motor vehicle engines in compliance with Title II of the CAA and the regulations thereunder. *See, e.g.,* 42 U.S.C. § 7521 (setting emission and OBD standards and directing EPA to establish standards by regulation); 40 C.F.R. § 86.007-11 (establishing emission standards for 2007 and later diesel heavy-duty engines and vehicles); 40 C.F.R. § 86.1844-01 (d)-(e) (listing information requirements for certificates of conformity applications, including calibration information); and 40 C.F.R. § 86.004- 25(a)(6) (defining "critical emissions-related components").

### D. Aftermarket Defeat Products

47. Third party entities develop products that are designed to alter, replace, or disable OEM-installed elements of design, including Emission-Related Elements of Design (hereinafter "Aftermarket Defeat Products").

48. A principal effect of Aftermarket Defeat Products is to bypass, defeat, or render inoperative Emission-Related Elements of Design.

49. Aftermarket Defeat Products' effect on vehicle power, vehicle fuel economy, or maintenance costs results directly from their effect of bypassing, defeating, or rendering inoperative Emission-Related Elements of Design.

50. Aftermarket Defeat Products can cause motor vehicles to emit hundreds to thousands of times more pollution than a motor vehicle with emission controls with properly functioning Emission-Related Elements of Design.

### I. EGR and Aftertreatment Defeat Products

51. Some Aftermarket Defeat Products physically interfere with (including via bypass or removal) exhaust recirculation in the EGR System. These products use blocker/block-off plates, replacement tubes, or other hardware to interfere with the recirculation of exhaust gas back into the engine combustion chamber, thereby defeating or rendering inoperative the vehicle's EGR System. These Aftermarket Defeat Products are hereinafter referred to as "EGR Defeat Products."

52. Some Aftermarket Defeat Products physically interfere with (including via bypass or removal) Aftertreatment Emission-Related Elements of Design by, for example, removing the DOCs, DPFs, NACs, OBD Sensors, and/or SCR Systems. Examples include so-called "delete pipes" or "straight pipes." These Aftermarket Defeat Products are hereinafter referred to as "Aftertreatment Defeat Products."

### II. Tunes and Tuners

53. Some Aftermarket Defeat Products are electronic software products (hereinafter "Tunes") that alter or overwrite aspects of a motor vehicle's ECU and/or OBD System.

54. Tunes can be stored and installed using specialized electronic devices that connect to a motor vehicle's ECU and overwrite the OEM software or Certified Stock Calibrations (hereinafter "Tuners").

55. Some Tunes or Tuners manipulate the ECU and/or OBD System to bypass, defeat, or render inoperative Emission-Related Elements of Design, including Certified Stock Calibrations, the EGR System, the SCR System, and/or other Aftertreatment. Other Tunes or Tuners electronically defeat the OBD system or allow for the full physical removal of Emission-Related Elements of Design; these Tunes or Tuners can accomplish this in many ways, including by working with Hardware Defeat Devices to manipulate the monitoring function of the OBD System, so that the OBD System will fail to detect the Aftermarket Defeat Products or the removal of one or more of a vehicle's Emission-Related Elements of Design.

### E. Enforcement Provisions

56. The sale of Aftermarket Defeat Products is prohibited under Section 203(a)(3)(B) the Act, 42 U.S.C. § 7522(a)(3)(b).

57. Section 204(a) of the CAA authorizes the district courts of the United States to restrain violations of Section 203(a)(3)(B). 42 U.S.C. § 7523(a). Sections 205(a)–(b) of the CAA authorize the Administrator to commence a civil action to recover civil penalties for each violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7524(a)–(b).

58. The maximum daily civil penalty amounts under Section 203(a)(3)(B) of the CAA are increased for inflation to $5,761 for violations that occurred after November 2, 2015, for which penalties are assessed on or after December 27, 2023. 42 U.S.C. § 7524(a); 40 C.F.R. § 19.4; 88 Fed. Reg. 89309 (Dec. 27, 2023).

## GENERAL ALLEGATIONS

59. Defendants sold automotive products online.

60. Between October 18, 2019 and September 2, 2020, Defendants sold approximately 672 illegal Aftermarket Defeat Products.

61. Defendants marketed and sold Aftermarket Defeat Products for motor vehicles equipped with Heavy-Duty Diesel Engines.

62. Defendants sold approximately 223 Aftertreatment Defeat Products, 119 EGR Defeat Products, and 330 Tunes/Tuners.

63. Defendants' product listings repeatedly contained product information and descriptions that demonstrated that the products' principal effect was to disable, defeat, or render inoperative Emission-Related Elements of Design installed on or in motor vehicles or motor vehicle engines.

64. For example, on February 11, 2020, Defendants sold a product identified as "GDP EZ LYNK 2016-2018 FOR NISSAN TITAN XD CUMMINS 5.0 DPF DEF CAT DELETE & PIPE."

65. On February 6, 2020, Defendants sold a product identified as "GDP 2011-2019 Ford Powerstroke EZ Lynk Tuner & SOTF Switch DPF EGR Delete Tuning."

66. On March 28, 2020, Defendants sold a product identified as "MBRP 4" Race Pipe DPF Delete Pipe for 17-20 6.7L Ford."

67. On May 29, 2020, Defendants sold a product identified as "2014-2019 EGR DELETE for Dodge Ram 1500 3.0L EcoDiesel."

68. On December 10, 2021, the EPA mailed an Information Request Letter ("IRL") to Spectrum's corporate address on file with the New York State Department of State. Between December 10, 2021 and April 1, 2024, the EPA did not receive a response to that IRL.

69. On January 26, 2022, EPA staff spoke with Ciccarelli over the phone. During the conversation, Ciccarelli denied having received the IRL, but did not provide for an alternative way for EPA to deliver it to him. However, the United States Postal Service ("USPS") Certified Mail receipt for the IRL, which was returned to the EPA's offices, shows an agent's signature. On January 31, 2022, the EPA re-issued the IRL to Defendants and mailed a second copy of the IRL to their corporate address.

70. On June 21, 2022, the EPA attempted to send Defendants a Warning Letter to their corporate address for their failure to respond to the IRL. On July 25, 2022, the USPS tracking showed that the letter was "unclaimed/being returned to sender," and the Warning Letter was returned to EPA on August 1, 2022.

71. Prior to April 1, 2024, the EPA attempted to send two additional copies of the IRL, and the Warning Letter, to Spectrum's corporate address. On November 16, 2023, the United States Attorney's Office for the Eastern District of New York ("USAO-EDNY") attempted to serve Defendants at their corporate address via a process server, who left a copy of the IRL with an individual who claimed that Ciccarelli no longer lived there.

72. On December 4, 2023, an agent from the EPA's Office of the Inspector General ("OIG") attempted to deliver the IRL and Warning Letter to the Defendants. The agent visited Spectrum's corporate address in Oakdale, New York and spoke with two individuals who claimed to be Ciccarelli's parents. The individuals claimed that Ciccarelli no longer resided with them at that address.

73. Two days later, on December 6, 2023, an attorney representing Ciccarelli in connection with this matter contacted the USAO-EDNY. Copies of the IRL and Warning Letter were sent to the attorney that day via email.

74. On April 1, 2024, the EPA received a partial response to the IRL. The partial response gave insufficient information which addressed only one out of the fourteen separate inquiries requesting detailed information in the IRL.

75. Sections 114(a) and 208(a) of the CAA authorize the EPA Administrator to require any person to make reports and provide information as required for determining compliance with the Act. Failing to make such reports or provide such information violates the CAA. 42 U.S.C. §§ 7414(a)(1)(B), (G), 7542.

**CLAIM FOR RELIEF**

**Violations for Sale of Aftermarket Defeat Products**

76. The United States re-alleges Paragraphs 1-75 above as if fully set forth herein.

77. From at least October 18, 2019 through September 2, 2020, Defendants sold, offered for sale, and/or caused the sale or offer for sale of approximately 672 Aftermarket Defeat Products.

78. Each Aftermarket Defeat Product that Defendants sold was intended for use with certified motor vehicles and motor vehicle engines.

79. A principal effect of each Aftermarket Defeat Product that Defendants sold is to disable, defeat, or render inoperative Emission-Related Elements of Design installed on or in motor vehicles or motor vehicle engines in compliance with Title II of the CAA.

80. Defendants knew or should have known that the Aftermarket Defeat Products it sold would be installed for the use or put to the use of bypassing, defeating, or rendering

inoperative devices or elements of design that control emissions of regulated air pollutants installed on or in motor vehicles or motor vehicle engines in compliance with Title II of the CAA.

81. Each unit of the Aftermarket Defeat Products that Defendants sold is a separate violation of Section 203(a)(3)(B) of the CAA, U.S.C. § 7524(a).

82. Unless enjoined, Defendants may continue to sell, offer for sale, and/or cause the sale or offer for sale of Aftermarket Defeat Products.

83. Defendants are liable to the United States for civil penalties and subject to injunctive relief.

**Relief Requested**

WHEREFORE, the United States respectfully requests that this Court:

A. Rule that Defendants sold, offered to sell, or caused the sale or offering for sale of automotive Aftermarket Defeat Products in violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B);

B. Assess civil penalties against Defendants for violations of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B);

C. Permanently enjoin Defendants from selling, offering to sell, or causing the sale or offering for sale of, vehicle parts or components intended for use with a motor vehicle or motor vehicle engine where a principal effect of such part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine to comply with Title II of the CAA;

D. Order Defendants to take other appropriate actions to remedy, mitigate, and offset the harm caused by its CAA violations;

E. Award the United States its costs and disbursements in this action; and

F.  Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

BREON PEACE
United States Attorney
Eastern District of New York

Dated: Brooklyn, N.Y.

January 8, 2025

*/S/  Matthew Silverman*
MATTHEW SILVERMAN
Assistant United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
718-254-6409
matthew.silverman@usdoj.gov

Of Counsel:

CASSANDRA BASILE
ERICK R. IHLENBURG
Office of Regional Counsel
U.S. Environmental Protection Agency
    Region 2